MEMORANDUM OF DECISION
This case presents petitions for the termination of the parental rights of Crystal T. and Charles K., who are the biological parents of two minor children, Tabitha T. and Christina K. Tabitha is now eleven years of age and Christina is nine. Both children wish to remain with their present foster mother and to be adopted by her.
The court finds that the mother has appeared and has a court appointed attorney. The court finds that the father has been served and, based on the testimony, has actual notice of the proceedings and the trial date and has failed to appear. These CT Page 10795 cases have been pending in the court system since December of 1994 and the biological father has not supported the children, has not had any physical involvement nor has demonstrated any interest in the children in the past three years except for one visit to Connecticut in 1994. The court further finds that it is unnecessary to appoint an attorney for him. The court has jurisdiction on this matter; there is no pending action affecting custody of the children in any other court.
The court, having read the verified petitions, the social studies, the various documents entered into evidence and heard the testimony of various case workers and evaluators, makes the following findings by clear and convincing evidence.
WITH RESPECT TO THE CHILDREN'S FATHER:
Charles K. is thirty-five years old and has resided in Colorado since 1993. He has not visited his children since April of 1994. Except for presents sent by mail at Easter and Christmas, he has not maintained contact with the children. The record documents repeated referrals of this family to the Department of Children and Families (hereafter the "Department"), and that the father physically abused both girls and sexually abused Christina while she was playing on a slide in a park. The children have only vague memories of him and have no relationship with him.
WITH RESPECT TO THE CHILDREN'S MOTHER:
Crystal T. is thirty-seven years old. She had a difficult and chaotic childhood and was the youngest of seven children. She was sexually abused by her father, a diagnosed schizophrenic. She married for the first time when she was not yet sixteen and the first of her six children was born two months after her sixteenth birthday. She was divorced in 1977, after her second child was two years old. Two more sons were born of her relationship with another man. In 1987, she married Charles K., the father of Tabitha and Christina. The parents are now divorced.
Since 1978, there have been twenty-three confirmed referrals of the family, fourteen were confirmed emotional neglect cases, thirteen confirmed physical neglect cases, one confirmed exposure, two confirmed sexual abuse and molestation cases of Tabitha and Christina by their brother, two confirmed at-risk cases, one confirmed risk of injury and one confirmed abandonment CT Page 10796 by Crystal.[2] Crystal has some significant mental health difficulties and has been hospitalized six times since 1978 for these conditions. She has been diagnosed with bi-polar disorder. She receives social security disability income for that diagnosis and a back problem. In 1993 and 1994 she was hospitalized four times for suicide attempts and suicidal ideation. She had extreme difficulty in dealing with her daily life stresses and the significant chaos and crisis with the children. The list of those events includes four evictions, moves, at least three house fires and a terrible motor vehicle accident in September of 1992 when she was driving. That accident claimed the life of her oldest son, Morgan. All of the children were injured and Tabitha was in intensive care for months afterward and slowly recovered.
Prior to trial, concerns were raised about Crystal's competency. A psychiatric competency evaluation was performed by Dr. Sadler who found her to be an intelligent woman more than capable of understanding the court proceedings, and assisting her lawyer in preparing and presenting an adequate defense.
Crystal on numerous occasions requested placement of her children by the Department when she became unable to care for them. The oldest and deceased child was placed four times, the second son three times, the third son three times and the fourth son four times. Tabitha and Christina have been placed twice, first in April of 1994 and then again in December of 1994. All placements were voluntarily requested by Crystal. The last placement was requested by Anthony, the oldest sibling, after mother left all the children and made a serious suicide attempt which she herself described in detail. She felt there was no hope and was overwhelmed by her life. As a result, she drove to the beach in New London in December and began to walk into the water when the intense cold apparently recalled her to her senses. She then sought medical and psychiatric treatment. Meanwhile, her children were terribly confused and worried about the whereabouts and safety of their mother.
Tabitha and Christina were adjudicated neglected on January 31, 1995. Since the placement of these children, their mother has continued to have personal difficulties, moved numerous times, but has shown improvement in her ability to cope and maintain a less chaotic home. She has done her best to visit regularly with all children in placement, although she has missed some visits and been late on some occasions and has complied with many of the expectations the Department has set for her. Despite her well CT Page 10797 intentioned efforts and her sincere love for these children, Dr. Freedman, the court appointed evaluator, in August of 1996 found her efforts to be:
 "far from effective, adequate rehabilitation. She had obtained a poor endorsement from a parenting skills instructor, had not had sufficient or intensive enough counseling to have a real endorsement, and the girls do not view her as a safe, reliable caretaker. Mother seemed able to manage her own life now, but had not shown sufficient growth to handle Tabitha or Christina."
Dr. Freedman also found that:
 "there were relationships between each girl and biological mother. However, these relationships were strained, Tabitha learning to stop trying to take care of her mother and Christina carefully keeping her distance from mother. Both girls made it clear that they do not wish to return to mother's care, now or in the future. Both girls had many traumatic memories of living with mother, and associated living with mother with being neglected, worrying about mother, and having terrible things happen to the family. The girls showed concern for their mother, mostly Tabitha but they did not show normal parent-child relationships." (Petitioner's Exhibit 3, page 18).
While it may be that in part Crystal's failure to rehabilitate is connected to her illness, mental illness does not prevent the court from proceeding in termination cases. The case law follows the rule that "[T]he legislature may properly strike the balance at the point where mental or physical deficiency, even though not involving fault, is as great as to render the parent incapable of measuring up to the child's needs as those are delineated in Connecticut General Statutes § 17a-112 (c) (3) (A)). In re Juvenile Appeal (83-BC), 189 Conn. 66, 78-79,454 A.2d 1262 (1983), also cited in In re Nicolina,9 Conn. App. 598, 605, 520 A.2d 639 cert. denied, 203 Conn. 804,525 A.2d 519 (1989). Similarly, in the case of In re David E.,4 Conn. App. 653, 655, 496 A.2d 229 (1985), the Appellate Court affirmed the trial court's finding that a termination of parental rights was appropriately granted where the respondent's continuing CT Page 10798 mental deficiency rendered her unable to provide the child with the necessary care, guidance and control necessary to his physical, educational, moral, and emotional well-being . . . A person may be mentally ill and yet not incompetent. In re LoriBeth D., 21 Conn. App. 226, 231, 572 A.2d 1026 (1990). Accordingly, there is precedent for proceeding against a competent, but mentally ill parent.
The testimony concerning Crystal's mental status in the last year is that she is functioning and coping well and that she is able to reasonably manage her own life. Dr. Freedman found in 1996: "In a relatively short term of counseling, without the immediate responsibility of children, it was possible to see how a counselor might not see signs of serious problems." (Exhibit 1, page 3). Nonetheless, he stated that Crystal:
 "had struggled to care for her children, but also had shown serious lapses in judgement and repeated inability to supervise, protect, or provide stability for the children. Mother showed signs of. . . . deteriorating under stress. She had not shown evidence that her functioning was dependable enough to handle one or more children returned to her care." (Petitioner's Exhibit 3, page 15).
If past behavior is indeed a good predictor of the future, there is reason to continue to have grave concern about Crystal's ability to parent these children, despite her best intentions.
Crystal herself admitted she is not yet ready to parent these children as she understands she still must address her own issues and needs. She believes that she has made significant progress, but she understood she was not always aware of the consequences of her actions on her children. She clearly had difficulties establishing the appropriate boundaries between parent and child.
WITH RESPECT TO THE CHILDREN:
Tabitha has had significant special needs, some of which have been identified since she has been in placement. She has always had a problem wetting and soiling her clothes. She has gradually improved since her placement in foster care and now is mostly dry and clean. She has been diagnosed as learning disabled and was described by her counselor, Martha Roberts, as having been "parentified" by her mother. Her need to care for her fragile CT Page 10799 parent has made it difficult for Tabitha to play as children must play in order to learn and grow, to experience joy and has retarded her personality development. It presents serious problems for her future ability to develop healthy relationships. Continued therapy and a nurturing foster care environment are helping her deal with these issues. Ms. Roberts spoke of this child's tremendous need for safety and security.
Christina's difficulties are also very apparent. She was diagnosed as suffering from reactive attachment disorder and has regularly shown highly sexualized behaviors. Ms. Roberts, the children's counselor, graphically reported on what she labeled "Christina's strut", which the children had talked about and which had been reported by other observers, but she had never seen until recently. It is the sexualized walk of a female adolescent seeking to attract young males. She stated it was indicative of the sexual abuse of this child by her brother Jeffery who had licked her genitals and the other suspected incidents of such abuse in her life. She felt that both girls had made tremendous progress since being in foster care. Her belief was also shared by Dr. Freedman who found both girls to be healthy and well adjusted. Dr. Freedman also testified that both children "were remarkably forthright about their wishes". In the many evaluations he has performed for the court, he has never heard two children express their safety needs so clearly.
ADJUDICATION
By clear and convincing evidence the court finds the following as of June 26, 1996, the adjudicatory date:
1. The father has no ongoing parent child relationship with Tabitha and Christina, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent child relationship would be detrimental to the best interest of the child; Connecticut General Statutes § Sec. 17a-112 (c) (3) (D). He has not had any contact with the children since 1994. They have no or only vague memories of their father. Further, given their need for security and permanency, it is not in their best interests that further time be allowed for the establishment of such a relationship. In re Migdalia M., 6 Conn. App. 194, 211,504 A.2d 532 (1986); In re Juvenile Appeal (84-3), 1 Conn. App. 463, CT Page 10800473 A.2d 795 cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984);In re Juvenile Appeal (Anonymous), 177 Conn. 648, 420 A.2d 875
(1979). The court finds that this ground has existed for more than one year.
2. The mother has no ongoing parent child relationship with her two daughters as it is defined in the statutes and case law. "It is reasonable to read the language of `no on-going parent-child relationship' to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been displaced." In re JuvenileAppeal (Anonymous), 177 Conn. 648, 670, 420 A.2d 875 (1979). See also In re Juvenile Appeal (Anonymous), 181 Conn. 638, 646,436 A.2d 290 (1980). Such displacement has occurred for these two girls, who are all too aware of their own needs for security and safety. The court has further stated that "In considering whether an ongoing-parent child relationship exists, the feelings of the child are of paramount importance. In re Michael M.,29 Conn. App. 112, 117-118, 614 A.2d 832 (1992). Without equivocation, Tabitha and Christina both stated that they do not wish to be returned to their mother. The next concern is whether it is in the best interests of these two children to allow further time for the relationship to reestablish itself. The court finds by clear and convincing evidence that question must be answered in the negative. There is no more time for these two girls, given their ages and needs.
3. Further, these children were previously found to be have been neglected on January 25, 1995. The court further finds the mother has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of these children that she could assume a responsible position in the life of these children. Connecticut General Statutes § 17a-112 (c) (3) (B). As previously noted, Crystal has tried valiantly to rehabilitate herself, but has been unable to make changes necessary for such rehabilitation. The court finds that both grounds have existed for more than one year.
4. The Department has alleged as to both parents and the children that the children have been denied, by reason of an act of commission or omission, the care, guidance or control CT Page 10801 necessary for their physical, educational, or emotional well-being. Connecticut General Statutes § 17a-112 (c) (3) (C). The court finds by clear and convincing evidence that the father caused them both physical harm. Crystal failed to protect them from harm from their father and their elder brothers. As stated by the court:
 "This provision authorizes the termination of parental rights where specific acts of parental commission or omission have caused serious physical or emotional injury to the child." In re Kelly S., 29 Conn. App. 600, 614, 616 A.2d 1161 (1992).
 See also In re Theresa S., 196 Conn. 18, 25-27, 491 A.2d 355 (1985); In re Sean H., 24 Conn. App. 135, 144-145, 586 A.2d 1171, cert denied, 218 Conn. 904, 588 A.2d 1078 (1991).
The court finds that this ground has existed for both parents for more than one year.
REQUIRED FINDINGS:
With respect to the mandatory factual findings required by Connecticut General Statutes § 17a-112 (e):
1. The timeliness, nature and extent of services offered. The court finds that parental, psychological and psychiatric services were offered, extensive other services were offered (Petitioner's Exhibit 8), supervised visitation was offered and foster care provided.
2. Whether the Department has made reasonable efforts to reunite the family pursuant to the Adoption Assistance and Child Welfare Act of 1980. The court finds that the Department has made reasonable efforts for a long period of time. The parents had more than enough time to demonstrate their desire and concern for reunification and to achieve rehabilitation. Crystal T. was offered services, not all of which she properly pursued or accepted, terminated counseling in the past and not benefited from the parenting classes she did attend.
3. The terms of applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations, etc. The court finds that the mother did not CT Page 10802 fulfill or comply fully with the expectations. Her turbulent background, the significant trauma she has experienced in her life and her psychiatric issues all contributed to her inability to do so. Due to Charles K.'s voluntary absence in his daughters' lives, no expectations were set for him as to do so would have been a useless act.
4. The feelings and emotional ties of the child with respect to the parents and foster parents, etc. The court finds that the children are bonded to their present foster mother, and that there are no presently existing adequate emotional bonds which will be broken by termination of the parents' rights.
5. As to the age of the children. Tabitha is eleven years old and Christina is nine. They have had traumatic and damaging early years while in the care of their mother. They themselves express their own needs for security and safety without hesitation. The court is aware of the deleterious effect of prolonged temporary care of abused and neglected children. In re Juvenile Appeal(84-CD), 189 Conn. 276, 455 A.2d 1313 (1983). The Appellate Court has also correctly noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992), see generally, JOSEPHGOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OF THE CHILD
99 (1979).
6. Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the children as part of an effort to reunite the children with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. The court finds that the mother has been unsuccessful in making any meaningful attempt to adjust her circumstances, conduct or condition to realistically facilitate reunification. While she has had continued contact with her daughters and contact with the Department, such contact has not overcome the problems which have existed. The father has made no attempt to do so.
7. The court finds that there has been nothing to prevent the parents from maintaining a meaningful relationship with the CT Page 10803 children. There was no unreasonable conduct by the Department and many efforts were made to reunify the children with their mother.
DISPOSITION
Based upon the foregoing findings, the court determines that it is in the best interests of Tabitha T. and Christina K. that a termination of parental rights enter with respect to Crystal T. and Charles K. and a termination of their parental rights is ordered. It is further ordered that the Commissioner of the Department of Children and Families is appointed statutory parent for these children for the purpose of securing an adoptive family. If the foster mother is willing to adopt, it is the court's direction that she receive first consideration, in view of her significance in the lives of these two girls. The Commissioner shall file with this court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by State and federal law.
Barbara M. Quinn, Judge Child Protection Session